# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SUZANNE M. NATALE, as Administratrix of | ) | |
| The ESTATE OF RICHARD NATALE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 13-30008-MAP |
| v. | ) | |
| | ) | |
| THE ESPY CORPORATION, | ) | |
| WHITNEY HARRIS, | ) | |
| MARK E. SMITH, and | ) | |
| THOMAS W. POTTHAST, | ) | |
| | ) | |
| Defendants. | ) | |

## OPPOSITION TO DEFENDANTS' MOTION to DISMISS, OR, IN THE ALTERNATIVE, TO TRANSFER VENUE

The Estate of Richard Natale (the "Estate"), by and through its undersigned attorneys, responds as follows to defendants' Motion to Dismiss the Complaint or, in the Alternative, to Transfer Venue (Dkt. No. 8). The Estate's beneficiaries are Administratrix Suzanne M. Natale, Richard's widow, minor son Sam, and Richard's son, Nicholas, an Air Force veteran. Since Richard's tragic death in 2006, the Estate has owned 23.4% of The Espy Corporation ("Espy"), of which Richard Natale was a founder and director. The shares in Espy are the Estate's only asset. Since 2007, Espy has reaped $ millions in profits. Yet since Richard's death, the Estate has received *nothing* from Espy: no dividends or other distributions of any kind. Espy is a Subchapter S corporation and reported income "flows through" to the shareholders. As a result, the Estate is now in arrears to the IRS and Massachusetts Department of Revenue in an approximate total of $320,000. That sum will rise substantially based on Espy's 2012 reported income. In sum, Richard Natale's widow and orphaned minor son face financial ruin as a direct result of the conduct of Smith, Potthast and Harris.

Defendants' view of the matter is different.  To the defendants, this is a "garden variety, internal shareholder dispute."  Defendants' Memorandum of Law, Dkt. No. 9 ("Defendants' Memo"), p.1.  In fact, according to Smith, Harris and Potthast, "what is alleged is not even sufficient to support that Plaintiff was treated unfairly."  *Ibid* . Put another way, "on their face, the allegations in the Complaint fail even to state a claim for unfairness, never mind the claims alleged." Defendants' Memo, p. 4.  Defendants' position is that the Estate, as minority shareholder, has no right to share in corporate profits or in any benefit of corporate ownership. According to defendants Smith, Harris and Potthast, they are the only shareholders entitled to the benefits of corporate ownership.

For the reasons set forth below, defendants are wrong, all counts of the complaint state claims upon which relief may be granted, and the case should remain in Massachusetts.

## I.

### SUMMARY OF THE ALLEGATIONS IN THE COMPLAINT

Before his tragic death in 2006 (¶ 16), Richard Natale was a computer systems engineer and skilled software developer (¶ 12).   He was one of the founding members of Espy (¶ 12).  Richard resigned from a secure position at Silicon Graphics, taking substantial personal and financial risk in opening Espy as a new venture (¶ 13).  Espy was and is a developer of commercial products for a variety of scientific analysis applications, including radio frequency exploitation (¶ 14).  Richard Natale's work ethic and programming talent were instrumental in Espy's success (¶ 15).

Throughout his career with Espy, Richard Natale resided in the District of Massachusetts, and worked primarily from his home in Brimfield, Massachusetts (¶ 23).  At the time of his death, Richard was employed full time as Espy's chief software engineer (¶ 17).  He owned 300 common shares of Espy, or approximately 24% of the shares issued and outstanding (*ibid*.).  Smith (31.2%),

Harris (23.4%), and Potthast (22.0%) were the remaining shareholders (¶¶ 19-21), as they are today (¶ 22).

Upon Richard's death, defendants Espy, Smith, Harris and Potthast undertook a joint and concerted effort to deprive the Estate of the true value of Richard Natale's ownership interest in Espy (¶ 28). The Estate had reasonable expectations of benefits to be derived from retaining its shares, but those expectations have been defeated by the misconduct of Smith, Harris and Potthast (¶ 29).  And the continuing wrongful conduct of Smith, Harris and Potthast harmed and continues to harm the Estate, and constitutes a departure from the standards of fair dealing and a violation of fair play on which the Estate was and is entitled to rely (¶ 31).

The particular methods used by Smith, Harris and Potthast to "squeeze" or "oppress" the Estate as minority shareholder included the following:

1)   For calendar years 2006, 2009, 2010, 2011, the Estate was assigned more than $600,000 in flow through income from Espy (¶ 32 a., j., n., r.).   This gave rise to onerous tax liabilities, and the approximate total of tax, penalty and interest owed to the IRS and Massachusetts Department of Revenue presently exceeds $320,000 (¶ 32 b., k., o., s.).  This is because Espy did not pay a dividend or make any other distribution with which the Estate could pay the taxes (¶ 32 c., l., p., t.,).  Defendants never disclosed to the Estate that they intended to steadily bleed the Estate and its beneficiaries (including Richard Natale's two sons) (¶ 32 cc. and dd.).

2)  In 2008 and 2009, defendants Smith, Harris and Potthast caused Espy to issue additional common shares of Espy to themselves but did not issue any additional shares to the Estate (¶ 32.d.)  Defendants have not provided to the Estate the minutes of the rump shareholders meeting at which the issuance of the shares was purportedly approved (¶ 32.e.).  In or about early 2009, defendants Smith, Harris and Potthast caused to be issued and circulated

through the mails an IRS Schedule K-1 for calendar year 2008 (¶ 32.f.).  The IRS Schedule K-1 for the calendar year 2008 falsely stated that the Estate's percentage of stock ownership was 12% (¶ 32.g.)  But for the rump shareholders meeting and defendants' issuance of additional shares to themselves, the Estate's interest was approximately 24% of Espy (¶ 32.h.).  Upon information and belief, this misleading document was circulated by U.S. mail, and the false information regarding share ownership percentages was reported to the Department of the Treasury, Internal Revenue Service (¶ 32.i.).  On three more occasions, defendants sent the same false information to the Internal Revenue Service (¶ 32.m., q., u.)

    3)  During the period from 2009 to date, defendants Smith, Harris and Potthast have siphoned the assets of the corporation by paying themselves substantial salaries and bonuses, leaving the Estate with no income or other return on its investment in Espy (¶ 32.v.-z.)

    4)  Defendants Smith, Harris and Potthast would likely have made statements to Espy's lenders and others – using the mails and wire communications – deliberately understating the Estate's interest in Espy, and overstating their own interest in Espy (¶ 32 aa.).

## II.

## THE LEGAL STANDARD UNDER RULE 12(B)(6)

    A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be denied so long as the Complaint contains a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting Fed. R. Civ. P. 8(a)(2) and citing and discussing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).  Such a statement of the claim requires only enough detail to provide fair notice to a defendant of what the claim is, and the grounds for the claim.  *Id.* at 12 (citing and quoting *Twombly*).  The Complaint is required to contain only enough factual allegations "to raise a right to relief above the speculative level" and state a claim that is

"facially plausible." *Id.*  The court must accept a complaint's well-pleaded facts as true and indulge all reasonable inferences in the plaintiff's favor. *Cook v. Gates,* 528 F.3d 42, 48 (1st Cir. 2008) (citation omitted).

## III.

## THE LAW RELATING TO OPPRESSION OF MINORITY SHAREHOLDERS

It has long been recognized that "holders of a majority of the voting shares in a corporation, through their ability to control a majority of the directors and to determine the outcome of shareholders' votes on other matters, have tremendous power to use a great variety of devices or modes of operation to benefit themselves at the expense of minority shareholders. . . ."  1 O'Neal and Thompson, *Oppression of Minority Shareholders and LLC Members* §3.2 (rev'd 2d ed. 2007). The squeezers may cut off a flow of income to a minority by refusing to declare dividends.  *See* Douglas Moll, *Majority Rule Isn't What It Used To Be:  Shareholder Oppression in Texas Close Corporations*, 63 Tex B.J. 434, 436 (2000).  The majority owners may pay themselves exorbitant salaries and bonuses.  *Id.*; *see also Sugarman v. Sugarman*, 797 F.2d 3 (1st Cir. 1986) (majority shareholder paid himself excessive salary and bonuses).  Furthermore, majority shareholders can diminish the minority's proportionate voting rights.  1 O'Neal and Thompson, *supra*, § 3.20.  All of the above squeeze techniques have been used by the defendants against the Estate.

Withholding dividends can be "especially devastating in S Corporation as all corporate income is passed through to the shareholders for tax purposes and shareholders are required to pay taxes on that income."  ."  1 O'Neal and Thompson, *supra*, § 3.2.  If no dividends are declared, shareholders will have no cash from the enterprise with which to pay those taxes. *See Corbin v. Corbin*, 429 F. Supp. 276 (M.D. Ga 1977): *White v. Perkins*, 213 Virginia 129 (1972).  For this reason, "[w]ithholding dividends is often applied when a minority shareholder is in financial straits. For example, a minority shareholder might be the widow or widower of a former employee or

director." 1 O'Neal and Thompson, *supra*, § 3.4. The targeting of a vulnerable widow and her children is precisely what happened here.

**ARGUMENT**

**I.**

**EACH COUNT OF THE COMPLAINT STATES A
CLAIM ON WHICH RELIEF MAY BE GRANTED**

**A. RICO CONSPIRACY**

The heart of the Estate's racketeering conspiracy claim is that "defendants sought to leverage every possible financial advantage from the untimely death of Richard Natale and expand the value of their ownership of Espy at the expense of the Estate." Complaint ¶ 62. In addition, "defendants Smith, Harris and Potthast agreed to oppress and reduce the value of the Estate's interest in Espy and also to deny the Estate any financial benefit from its ownership interest in the enterprise." *Ibid.* ¶ 63. The defendants' conduct falls within the language of 18 U.S.C. § 1962, which bars defendants from using their control over an enterprise to defraud and harm their co-owners. While their methods were not those of traditional organized crime, the Supreme Court held decades ago that RICO is not limited to traditional organized crime. *United States* v. *Turkette*, 452 U.S. 576 (1981).

Count VII charges that defendants conspired under 18 U.S.C. § 1962(d) to violate two substantive provisions of Section 1962. The first substantive RICO offense, Section 1962(b), makes it unlawful for "any person through a pattern of racketeering . . .to acquire or maintain . . . any interest in or control of "an enterprise engaged in interstate or foreign commerce. Complaint ¶ 60(a). The second substantive offense, Section 1962(c), makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce . . . to

conduct or participate directly or indirectly . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Complaint ¶ 60(b).

Section 1961 defines the terms "enterprise" and "pattern of racketeering activity" as follows:

> (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

> (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

Discussing Section 1961(4) in *Turkette*, the Supreme Court described an "enterprise" as "a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U.S. at 583. The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* The Estate has sufficiently alleged that defendants acted together as a unit to engage in oppressive conduct toward the Estate.

In *Reves* v. *Ernst & Young*, 507 U.S. 170 (1993), the Supreme Court held that RICO requires that a defendant "participate in the operation or management of the enterprise itself." *Id.* at 173. The Court cautioned, however, that "RICO liability is not limited to those with a formal position in the enterprise"; rather, it extends to those who have "*some* part in directing the enterprise's affairs." *Id.* at 179 (emphasis in original); *see United States* v. *Oreto*, 37 F.3d 739, 749-750 (1st Cir. 1994). Smith, Harris and Potthast all qualify.

A person conducts the affairs of an enterprise through a pattern of racketeering activity "when (1) one is able to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate

offenses are related to the activities of that enterprise." *United States* v. *Scotto*, 641 F.2d 47, 54 (2d Cir. 1980).

Defendants contend (Defendants' Memo at 8-13) that the Estate fails to sufficiently allege racketeering acts of mail fraud, wire fraud, and extortion. As shown below, defendants are incorrect. 18 U.S.C. § 1341 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ." and uses the mails "for the purpose of executing such scheme or artifice or attempting so to do," is guilty of an offense. The companion section, Section 1343, proscribes using wire communications "for the purpose of executing" a scheme to defraud.

The elements of mail fraud are: first, a scheme, substantially as charged in the indictment, to defraud, or to obtain money or property by means of false or fraudulent pretenses; second, defendant's knowing and willful participation in this scheme with the intent to defraud, or to obtain money or property by means of false or fraudulent pretenses; and third, the use of the United States mail, on or about the date charged, in furtherance of this scheme. *Pattern Criminal Jury Instructions in First Circuit*, Section 4.18.1341 (2003). *United States v. Kenrick*, 221 F.3d 19, 26-27 (1st Cir. 2000) (en banc); *United States v. Sawyer*, 239 F.3d 31, 39-40 (1st Cir. 2001). The elements of wire fraud are similar. *Pattern Criminal Jury Instructions in First Circuit*, Section 4.18.1343 (2003).

A scheme to defraud under Sections 1341 and 1343 can be based on omissions and nondisclosures. *United States v. O'Malley,* 707 F.2d 1240, 1246 (1983) ("intent to defraud may be evidenced in any way, including non-action, on the part of the defendant. Fraud, for purposes of a mail fraud conviction, may be proved through the defendant's non-action or non-disclosure of material facts intended to create a false and fraudulent representation.") The Estate alleges nondisclosures including: 1) defendants' not disclosing to the Estate that it would receive no

dividend or other cash to pay accrued taxes, and 2) not disclosing to the Estate that it would receive no benefit for its investment in Espy.  Complaint ¶ 64.a.  While the elements of mail and wire fraud differ than those of common law fraud, it is significant to note that such omissions have been the basis of common law fraud claims in the close corporation context.  See B, *infra*.  Furthermore, the omissions left the Estate in a position where its tax liability has grown substantially every year since 2009, putting the Estate and its beneficiaries under tremendous financial pressure.

In addition to the omissions, part of the fraud was that in 2008 and 2009, defendants Smith, Harris and Potthast caused Espy to issue additional Espy common shares to themselves but did not issue any additional shares to the Estate.  Complaint ¶ 32.d.  The complaint further alleges that defendants withheld from the Estate the minutes of the rump shareholders meeting at which the issuance of the shares was purportedly approved.  *Ibid.* ¶ 32.e.  But for the rump shareholders meeting and defendants' issuance of additional shares to themselves, the Estate's interest was approximately 24% of Espy.  *Ibid.* ¶ 32.h.  The Estate claims that Schedule K-1's "falsely" reporting a diminished percentage holding for the Estate were filed with the Internal Revenue Service in 2009 (¶32.i.), 2010 (¶32.m.), 2011 (¶32.q.), 2012 (¶32.u.).   So on five identified occasions, the defendants filed false and misleading documents with the IRS to the detriment of the Estate.  This is surely sufficient to satisfy Fed. R. Civ. P. 9(b).

Defendants state that "[a]lthough Plaintiff appears unhappy with this issuance of shares, her [sic] Complaint does not allege that this company action lacked legal effect."  Defendants' Memo at 10.  It is difficult to respond to this assertion, given that the Complaint on several occasions refers to characterization of the Estate as a mere 12% owner as "false" (¶¶ 32.g., i, u.) and the Schedule K-1's so characterizing its ownership as "misleading" (¶¶ 32.i) or misrepresenting (¶¶ 32.m., q., u.) the Estate's ownership interest in Espy.  The defendants also withheld the minutes of the "rump" meeting at which the issuance of shares allegedly occurred.  Complaint ¶ 32.e.  While

defendants may or may not have followed corporate niceties, issuing the shares and by fiat
attempting to diminish the Estate's interest in Espy had no legal basis. And making false
statements to the IRS about the effect of this legally baseless maneuver is a scheme to defraud.
There is thus sufficient basis for the mail and wire fraud predicates to go forward.[1]

Finally, the economic extortion predicates under Mass. Gen. L. ch. 271, § 39B, are
sufficient to withstand a motion to dismiss. Threats can be implicit as well as explicit. By
continuing to ratchet up the financial pressure on the Estate year after year, the defendants made a
de facto economic threat to the Estate.

Defendants also claim that the Estate fails to adequately allege a pattern of racketeering
activity. Defendants Memo at 14-19. As shown below, they are incorrect. Section 1961(5), quoted
above, does not so much define the term "pattern of racketeering activity" as state a minimum
necessary condition for the existence of such a pattern. H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S.
229, 237 238 (1989). Establishing a pattern of racketeering activity requires proving two or more
racketeering acts. *Sedima*, 473 U.S. at 497 n.14. "[T]o prove a pattern of racketeering activity, a
plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount
to or pose a threat of continued activity." H.J. Inc., 492 U.S. at 232; Sever v. Alaska Pulp Corp.,
978 F.2d 1529, 1535 1536 (9th Cir. 1992) (applying H.J. Inc.).

Continuity is established because year after year, defendants' omissions and false
statements have harmed the Estate in the manner described above. They will continue to commit
the same offenses indefinitely into the future unless a judgment of this Court stops them. The
offenses are related because all revolve around the same goals:  that "defendants sought to leverage
every possible financial advantage from the untimely death of Richard Natale and expand the value

---

[1] Although these acts are not alleged separately in paragraph 62, they are incorporated by reference
into the RICO conspiracy count. Complaint ¶ 57.

of their ownership of Espy at the expense of the Estate" (Complaint ¶ 62) and that "defendants Smith, Harris and Potthast agreed to oppress and reduce the value of the Estate's interest in Espy and also to deny the Estate any financial benefit from its ownership interest in the enterprise." *Ibid.* ¶ 63. All of the alleged predicate acts relate to these ends.

Defendants conclude (Defendants Memo at 18-20) with a claim that the Complaint fails to allege that their conduct is the proximate cause of harm to the Estate. For all of the reasons set forth in the pages above, this claim is baseless. Defendants could have issued dividends, made distributions of other kinds, refrained from deliberately attempting to dilute the Estate's ownership. By instead attempting to leverage every advantage from Richard Natale's death, they have caused, and continue to cause, grievous harm to the Estate. Their collective actions demand a remedy.

### B. FRAUD

Count V alleges fraud on the part of defendants. This count is based in part on defendants' omissions as alleged in Paragraphs 32.cc. and 32.dd. In cases where, as here, there is a fiduciary duty owed by the non-disclosing party (*see* E., *infra*), the allegations in the complaint are sufficient to state a claim of fraud. Indeed, Texas courts have held that a breach of fiduciary duty is a form of constructive fraud. *Redmon v. Griffith*, 202 S.W. 3d 225, 240 (Tex.App. 2006).

In response to a claim of "fraud and abuse of his controlling position" by a majority shareholder in a closely held corporation, the Texas Supreme Court fashioned a remedy in circumstances remarkably similar to the instant case. *Patton v. Nicholas*, 154 Tex. 385 (1955). Patton was the 60 percent owner of a close corporation. The other two shareholders, J.W. Nicholas and Robert R. Parks, each owned 20 percent of the company's stock. The corporation continuously earned profits and the net worth of the corporation steadily increased. Patton, however, refused to declare a dividend. Nicholas and Parks eventually sued, alleging that Patton had committed

fraud and abuse of his controlling position.  At trial, the jury found in part that Patton

"wrongfully dominated and controlled the Board of Directors so as to prevent the declaration of

dividends," and that Patton "did this for the sole purpose of preventing Nicholas and Parks from

sharing in the profits to be derived from the operation of the corporation." *Id*. at 390.

The Texas Supreme Court found that,

> No dividend [was] paid in the more than six years since the
> corporation was organized, during which time petitioner has regularly
> received a salary ranging from $35,000 to $18,000 (his agreed first year
> salary of $12,000 being raised after the resignation of the respondents)
> while respondents, of course, received nothing except the $2000 paid to
> each prior to their resignations. At the same time the net worth of the
> corporation steadily increased, the surplus coming up from zero to
> about $130,000, or almost half of the capital stock, while the notes and
> accounts payable and total wages and salaries paid on the one hand, as
> well as inventory of goods for sale on the other, appear also to have
> become much larger, indicating no fear of business depression on
> petitioner's part or that of the other directors.

*Id*. at 390.

> We do believe that, coupling all the circumstances indicating the
> petitioner's intent to eliminate the respondents from every connection
> with the business, and at an unfair sacrifice on their part, with the fact
> that no dividends were paid in the face of an accumulation of surplus
> (in the form of property and cash) at the rate of almost 10% per annum,
> the findings of malicious suppression of dividends must be sustained.

*Id*. at 394.

Aggrieved minority shareholders have thus sought and received remedies in

fraud claims based on substantial similar allegations.  The fraud claim in the

Complaint should stand.

## C.  THEFT

The claim of theft alleged in Count VI is based on defendants' misappropriation of Espy assets by paying themselves substantial salaries and bonuses while the Estate received no distributions of any kind.  Because that misconduct can be remedied under counts in the complaint, the Estate does not oppose dismissal of this count without prejudice to renew, depending on the additional evidence uncovered during discovery.

## D.  CONVERSION

Massachusetts applies the "functional approach" established in *Bushkin* to claims of conversion.  *See, e.g., Shawmut Worcester County Bank v. First Am. Bank & Trust*, 731 F. Supp. 57, 59 (D. Mass. 1990) (finding that where plaintiff brought claims of conversion "[i]n Massachusetts, the choice of law in actions such as this depends on a number of factors as set forth in *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (1985)."  The bottom line for the conversion claim is that the Estate's reasonable expectations, and Massachusetts' interest in protecting Estates being administered in its courts, call for the application of Massachusetts law.

Defendants argue (Defendants' Memo 29-30) that the Estate must identify the specific chattel which has been converted. It is true that the Estate cannot identify specific property that has been subject to conversion.   But the Estate has identified instances in which the defendants siphoned assets and made stock deals advantageous to themselves.  That should be sufficient to allow the conversion count to stand for now.

## E.  BREACH OF FIDUCIARY DUTY

This case presents a textbook example of the use of squeeze-out techniques by majority owners of a closely held corporation to rid themselves of an unwanted minority owner.

The Court should apply Texas law to determine the duties of the shareholders to each other. *Harrison v. NetCentric Corp*., 433 Mass. 465 (2001) (Absent unique circumstances, laws of state of incorporation generally control internal corporate governance).  Texas law permits claims based on "breach of fiduciary duty by way of shareholder oppression . . ." *Redmon v. Griffith*, 202 S.W.3d at 241 (Tex. App. 2006).

In *Redmon*, which defendants do not cite, plaintiffs were minority shareholders in a closely held corporation, and had little control over corporate decisions.  The court found that "[s]uch allegations combined with allegations in the [plaintiffs'] pleadings that the [defendants] engaged in wrongful conduct and a lack of fair dealing with regard to the company's affairs to the prejudice of the [plaintiffs] sufficiently alleges a breach of fiduciary duty by way of oppressive conduct." *Id*. at 238.

Defendants also fail to cite the Texas Supreme Court's decision in *Patton v. Nicholas*, *supra*.  In affirming the jury findings discussed above, the Patton court noted that "the malicious suppression of dividends is a wrong akin to a breach of trust, for which the courts will afford a remedy." The court crafted a mandatory injunction requiring the corporation to pay a reasonable dividend "at the earliest practical date" as well as in future years.

In *Duncan v. Lichtenberger*,  671 S.W.2d 948, 950 (Tex. App. 1984), yet another case not cited by defendants, Duncan owned 60 percent of a close corporation that operated a night club, and the two minority shareholders each owned 20 percent.  When the company began to experience financial difficulties, Duncan discharged the two minority shareholders from their corporate positions. Although Duncan continued to receive management fees and officer compensation, the minority shareholders "never received any compensation as corporate officers and no dividends were ever distributed to shareholders."  The minority shareholders sued, asserting that Duncan had breached a fiduciary duty owed directly to them. The jury agreed, and damages were awarded to

the two minority shareholders. The Texas court of appeals upheld the jury's findings, observing that "[t]he breach of a fiduciary duty is the type of wrong for which the courts of this State will afford a remedy." *Id.* at 953, quoting *Patton*, 279 S.W.2d at 854.

Defendants rely solely on the Texas Court of Appeals decision in *Argo Data Resource Corp. v. Shagrithiya*, 380 S.W. 3d 249 (2012). In the specific facts of that case, the court of appeals found that the plaintiff – a sophisticated business person who formed the corporation together with the defendant – had not made out a claim of suppression of dividends. In that case, however, "the evidence shows that ARGO did, in fact issue over $25 million in dividends during the time period" that plaintiff claims the corporation was retaining its earnings. *Id.* at 270. Furthermore, it was undisputed that plaintiff received his 47% proportional share of those dividends. *Id.* It makes little sense to compare such a plaintiff to the Natale Estate.

### F. UNJUST ENRICHMENT

Unjust enrichment is defined as "retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Santagate v. Tower*, 64 Mass. Ct. App. 324, 328 (Mass. App. 2005) (citations omitted). To state a claim for unjust enrichment, a plaintiff must allege facts indicating "unjust enrichment of one party and unjust detriment to another party." *Salamon v. Terra*, 394 Mass. 857, 859 (1985).

That is the essence of the Estate's allegations. Defendants unjustly enriched themselves by issuing themselves additional common shares of Espy, and receiving tax benefits and other income while failing to consider the tax consequences to the Estate of the allocation of flow-through income as reflected in annual K1 statements issued in 2006, 2010, 2011 and 2012. The First Circuit recognized in *Lawton v. Nyman*, 327 F.3d 30 (1st Cir. 2003), that the equitable remedy for

unjust enrichment is available in the case of "a breach of fiduciary duty by corporate officers who are majority shareholders in close corporations."[2]

### G. CIVIL CONSPIRACY

Massachusetts applies the "functional approach" established in *Bushkin* to claims of civil conspiracy. *See, e.g., Law Offices of Jeffrey S. Glassman v. Palmisciano*, 690 F. Supp. 2d 5, 14 (D. Mass. 2009) (applying the *Bushkin* analysis to a civil conspiracy claim (because it is a tort claim), and finding that Massachusetts law applied to the claim because states have an interest in protecting their citizens, the plaintiff was located in Massachusetts, the contract between the parties was formed in Massachusetts, and the injury was suffered in Massachusetts). Massachusetts has a substantial interest in protecting estates being administered in its courts – and the beneficiaries of those estates.

Regardless of which state's law applies, however, defendants contention that the Complaint fails to adequately plead a "meeting of the minds" for purposes of the conspiracy. The totality of the factual allegations are sufficient, we submit, to establish knowing, concerted conduct sufficient to defeat a motion to dismiss.

---

[2] Defendants' contentions notwithstanding, Massachusetts Law applies to the unjust enrichment claim. Massachusetts applies a multi-factor "functional approach" to choice-of-law claims that is "explicitly guided by the Restatement (Second) of Conflict of Laws." *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 670 (1985). In particular, Massachusetts applies the "functional approach" established in *Bushkin* to claims of unjust enrichment. *See Levin v. Dalva Broth., Inc.*, CIV.A.01-11354-PBS, 2005 WL 352863 (D. Mass. Feb. 14, 2005) (citing *Bushkin* for the factors of consideration to determine that New York, not Massachusetts, law applied to an unjust enrichment claim when plaintiffs' agent conducted business, negotiated, and purchased items on behalf of plaintiff in New York and arranged to have the items shipped to Massachusetts), *aff'd in part, vacated in part sub nom. Levin v. Dalva Bros., Inc.*, 459 F.3d 68 (1st Cir. 2006) (affirming conflicts of laws decision in lower court, while vacating on other grounds).

## II.

## THE CASE SHOULD NOT BE TRANSFERRED TO TEXAS

Venue in this district is proper under 28 U.S.C. § 1391.  Specifically, subsection (b)(2) of that statute provides that venue is appropriate in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ."  28 U.S.C. § 1391(b)(2).  In applying this provision, the question is "whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts[.]"  *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001).  Moreover, courts must look "not to a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim."  *Id.*  Furthermore, the inquiry is not confined to the acts of the defendants.  *Id.* at 42 n.6.  Rather, a court must employ a "holistic" view of the case.  *See id.*  Finally, an event need not be in dispute to comprise a substantial event giving rise to the claim.  *See id.* at 43.

In this case, venue is statutorily proper in this judicial district.  Courts have repeatedly held that an action is properly venued in a given district if the defendant's contacts with that district satisfy the "relatedness" test for the purposes of personal jurisdiction.  *See, e.g., Culebra II, LLC v. River Cruises & Anticipation Yachts, LLC*, Civ. No. 07-13-P-H, 2007 U.S. Dist. LEXIS 41045, at *37 (D. Me. June 4, 2007); *Robinson Mfg. Co. v. Banc of Am. Commer.*, LLC, 02-42-P-H, 2002 U.S. Dist. LEXIS 10816, at *29 (D. Me. June 7, 2002).   As shown in Exhibit 1, defendants advertised a presence in Massachusetts and posted a Wayland phone number on their website.  Sometime between March 25, 2012, and the beginning of this year, the reference to the Espy's Massachusetts presence disappeared.  It is likely no coincidence that the alteration of the website followed on the heels of the Estate's May 2012 demand letter.

Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district where it may have been brought "for the convenience of parties and witnesses, in the interest of

justice."  In addition to the convenience of parties and witnesses, the factors to be considered by the court include the availability of documents; the possibility of consolidation; and the order in which the district court obtained jurisdiction.  *Coady v. Ashcraft & Gerel*. 223 F.3d 1, 11 (1ˢᵗ Cir. 2000). The burden of proof rests with the party seeking transfer; there is a strong presumption in favor of the plaintiff's choice of forum.  *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

Transferring the case to Texas would work extreme hardship on the Estate.  The Estate's beneficiaries all reside, work, and go to school in Massachusetts.  The administratrix, Ms. Natale, has not been in Texas since August 2004, to attend Richard's son Nick Natale's graduation from Basic Training at Lackland AFB, San Antonio.

Furthermore, the Probate and Family Court, Hampden County, Massachusetts, presently has jurisdiction over the Estate in Docket No. 06P1862AD1.  This gives the Commonwealth a particularly strong interest in the disposition of the Estate's claims.  This is especially true because one of the beneficiaries and victims of defendants' malfeasance is Samuel Natale, a minor residing in Massachusetts.

Finally, the affidavit submitted by defendant Mark Smith notwithstanding, www.espy.com at least through March 2012 stated that business development and sales were located in Wayland, Massachusetts.  The phone number on the website was 508-358-9989.  The reference to a Massachusetts "business development and sales" presence was removed from www.espy.com sometime after March 31, 2012.  The Estate wrote to the defendants complaining of their behavior in May 2012.  An expert analysis finds it reasonable to assume that Espy began to "de-emphasize," *i.e.*, attempt to hide, its Massachusetts contacts in September 2012.  *See* Exhibit 1.  At that time, the record will show, the parties were engaged in correspondence that was the prelude to this litigation. The Court should not reward such sharp tactics by transferring the case to Texas.  This litigation should remain in Western Massachusetts before this Court.

**III.**

**CONCLUSION**

For all of the above reasons, all counts of the Complaint state a claim upon which relief

may be granted, and those claims should be litigated in the District of Massachusetts before this

Court.


Dated:  April 15, 2013                                   Respectfully submitted,
                                                         THE ESTATE OF RICHARD NATALE
                                                         By Its Attorneys:


                                                         /s/*Andrew Levchuk*
                                                         Andrew Levchuk
                                                         BBO No. 545189
                                                         Bulkley, Richardson and Gelinas, LLP
                                                         1500 Main Street, Suite 2700
                                                         Springfield, Massachusetts  01115-5507
                                                         Tel:  (413) 781-2820
                                                         Fax:  (413) 272-6805
                                                         alevchuk@bulkley.com




CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 15, 2013, this document was filed through the ECF
system and will be sent automatically to counsel of record as identified in the Notice of Electronic
Filing.


                                              */s/Andrew Levchuk*
                                              Andrew Levchuk